GREAT FALLS & TETON COUNTY RY. CO., APPELLANT, *v.*
GANONG ET AL., RESPONDENTS.

(No. 3,330.)

(Submitted September 15, 1913.   Decided October 6, 1913.)

[136 Pac. 391.]

*Railroads—Eminent Domain—Right of Way—Extent of Right
—Competing Lines—Priority of Right—Evidence—Insuffi-
ciency.*

Railroads—Eminent Domain—Selection of Land—Improper Method.
   1.  Mere mental selection of a particular tract of ground by the
officers of a railroad company is not of itself sufficient to give it a
preference right to acquire the ground by condemnation, as against
the rights of a competing company.

Same—Right of Way—Limit of Right—Statutes.
   2.  The extent of the right acquired by a railroad company under
subdivision 4, section 4275, Revised Codes, which limits the quantity
of land such a corporation may condemn for right of way purposes to
"100 feet on each side of its center line," is confined to its necessities;
in the absence of any need for the full amount thus prescribed, it
cannot take it either as against the will of the owner or the require-
ments of a competing line.

Same—Right of Way—Extent of Right—Waiver.
   3.  The privilege extended to a railroad corporation by subdivision
4 of section 4275, Revised Codes, of taking a strip of land of the full
width of 200 feet for right of way purposes, as distinguished from other
purposes provided for in subdivisions 3 and 7, may be and is waived by
taking a less amount.

Same—Right of Way—Evidence of Selection—Insufficiency.
   4.  A railroad company, in projecting a route through a town, had
staked a line through the center of one of its streets 80 feet wide,
caused it to be mapped, and subsequently approved by its executive
officer.   In an action by a rival company looking to the condemnation
of a strip of land 60 feet wide immediately adjoining one side of the
street, evidence *held* insufficient to sustain a finding that such strip
had already been appropriated by the first company for a public use of
equal necessity, *viz.*, for right of way purposes, under subdivision 4 of
section 4275, Revised Codes.

*Appeal from District Court, Teton County; J. B. Leslie, Judge.*

Proceedings in eminent domain by the Great Falls & Teton
County Railway Company against E. H. Ganong and others.
From an order in defendants' favor, plaintiff appeals.   Reversed
and remanded.

*Messrs. Veazey & Veazey* and *Mr. Phil. I. Cole,* for Appellant, submitted a brief; *Mr. I. Parker Veazey, Jr.,* argued the cause orally.

We contend that, under the law and the authorities, a line is not definitely located or established, and no priority can possibly be obtained until the board of directors of the corporation has finally adopted and established the center line of the railway. Before property can be stamped with a public use or appropriated to public uses, the corporation, as distinguished from its engineers or other agents, must have acted. Engineers acting on behalf of the company have not the power to determine whether the power of eminent domain, vested in the corporation, should be exercised, or the power to appropriate property to the public uses of the corporation. It is only the author of the enterprise—not the subordinates—that must determine what land shall be taken. In the case of a corporation this can be done only by the board of directors.

"The making of a preliminary survey by an engineer of a railroad company, never reported to the company or acted upon, will not prevent another company locating the same line." (Lewis on Eminent Domain, 3d ed., p. 905.) This principle runs through all of the authorities; and even in a state where the "stake theory" seems to be sustained, the fact of the prior adoption of the center line by the board of directors is always emphasized as one of the facts without which there cannot be a location. (*Chesapeake & O. Ry. Co.* v. *Deepwater Ry. Co.,* 57 W. Va. 641, 50 S. E. 890; *Williamsport etc. R. Co.* v. *Philadelphia etc. R. Co.,* 141 Pa. 407, 12 L. R. A. 220, 21 Atl. 645; *Toledo Traction Co.* v. *Indiana etc. Ry. Co.,* 171 Ind. 213, 86 N. E. 54; *Bridwell* v. *Gate City Terminal Co.,* 127 Ga. 520, 10 L. R. A. (n. s.) 909, 56 S. E. 624; *Johnston* v. *Callery,* 184 Pa. 146, 39 Atl. 73; *Kaufman* v. *Pittsburg etc. R. Co.,* 210 Pa. 440, 60 Atl. 2; *Central Mills Co.* v. *New York etc. R. Co.,* 127 Mass. 537.) The Puget Sound Company, however, contends that its board has acted and delegated to the assistant to its president authority to locate the center line. But directors, unlike stockholders,

cannot act by proxy and they cannot delegate their powers. Such an important corporate function as the definite location of the center line of a railway cannot be delegated by the board, but is an act which must be performed by the board itself. (*Weidenfeld* v. *Sugar Run R. Co.,* 48 Fed. 615.)

In Montana, no priority can be gained unless the tentative designation of the route, by survey or otherwise, and the adoption thereof by the corporation, is followed by a condemnation suit or a legal or equitable purchase placed on the records. Mr. Lewis draws this conclusion as to the situation in Montana: "In cases where no location or survey is necessary, and where the statute does not require any map, survey or description to be recorded, that person will have priority of right to appropriate, particularly property, who first institutes proceedings to condemn it, or secures a contract therefor." In support of this proposition see the following cases: *White River R. Co.* v. *Batesville etc. Tel. Co.,* 81 Ark. 195, 98 S. W. 721; *Lake Merced Water Co.* v. *Cowles,* 31 Cal. 214; *Minneapolis etc. R. Co.* v. *Chicago, M. & St. P. R. Co.,* 116 Iowa, 681, 88 N. W. 1082; *Atlanta, K. & N. R. Co.* v. *Southern R. Co.,* 131 Fed. 657, 66 C. C. A. 601; *Southern Indiana Ry. Co.* v. *Indianapolis etc. R. Co.,* 168 Ind. 360, 13 L. R. A. (n. s.) 197, 81 N. E. 65; *Barre R. Co.* v. *Montpelier & W. R. R. Co.,* 61 Vt. 1, 15 Am. St. Rep. 877, 4 L. R. A. 785, 17 Atl. 923; *Toledo Traction Co.* v. *Indiana etc. Ry. Co.,* 171 Ind. 213, 86 N. E. 54; *Rochester etc. R. Co.* v. *New York etc. R. Co.,* 110 N. Y. 128, 17 N. E. 680.

*Messrs. Cooper & Stephenson* and *Mr. H. H. Field,* for Respondents, submitted a brief; *Mr. Samuel Stephenson* argued the cause orally.

Under section 7335, subdivisions 1 and 2, and sections 4275 and 7349, Revised Codes, it was manifestly the intention of the legislature of this state to permit railroad corporations to take possession of real estate for the purpose of locating its line of railway without the necessity of condemning the property and of course to continue in possession thereof for such time as

would be necessary to enable it to commence the actual construction of its line, and it only becomes necessary to condemn and to pay the award when it is ready to do something other than the work necessary in order to make its location. It must therefore follow that where a railroad corporation has made a location of its line and placed the stakes upon the ground, and mapped out its station grounds, that it has appropriated its right of way and has possession of the same, together with its necessary grounds, just as effectually as if it had actually acquired its right of way by purchase or otherwise. And for this reason we contend that the lands involved in this condemnation proceeding were already appropriated to a public use by the Chicago, Milwaukee and Puget Sound Railway Company when this proceeding was instituted.

The Chicago, Milwaukee and Puget Sound Railway Company, as shown by the evidence, did not build its line into the state of Montana. It purchased a line of railway in the state of Montana that was already constructed. It thereafter filed a copy of its articles of incorporation with the secretary of state, and we contend that, under the provisions of sections 4271, 4291 and 4299, Revised Codes, it had a right to construct such branch lines in the state of Montana as it saw fit, without the necessity of filing any resolution or taking any other action. In support of this proposition we cite the following authorities: *Western Pennsylvania R. Co.'s Appeal,* 99 Pa. 155; *Mayor of Pittsburg* v. *Pennsylvania R. Co.,* 48 Pa. 355; *Tyler* v. *Elizabethtown & Paducah R. Co.,* 9 Bush (Ky.), 510; *Atlantic etc. R. R. Co.* v. *St. Louis,* 66 Mo. 228; *Pittsburgh etc. Ry. Co.* v. *Pittsburgh etc. R. Co.,* 159 Pa. 331, 28 Atl. 155; *Rudolph* v. *Pennsylvania etc. R. R.,* 166 Pa. 430, 31 Atl. 131; *Blanton* v. *Richmond etc. R. R. Co.,* 86 Va. 618, 10 S. E. 925; *Wheeling Bridge etc. Ry. Co.* v. *Camden Con. Oil Co.,* 35 W. Va. 205, 13 S. E. 369; *Howard County* v. *Boonville Central Nat. Bank,* 108 U. S. 314, 27 L. Ed. 738, 2 Sup. Ct. Rep. 689; *McAboy's Appeal,* 107 Pa. 548.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This is an appeal from certain findings and an order made in a proceeding in eminent domain, instituted by the Great Falls & Teton County Railway Company against E. H. Ganong and others, to condemn certain lands for railway purposes. The facts disclosed by the record are: That in 1910 the Chicago, Milwaukee and Puget Sound Railway Company, which had by construction and purchase secured a main line of road from Mobridge, South Dakota, to Seattle and Tacoma, in Washington, duly authorized the construction of a branch line from its main line at Saugus, Custer county, through the cities of Lewistown and Great Falls, the town of Chouteau, and on to the Canadian boundary. In August, 1912, the engineers of that company, acting under Charles A. Goodnow, assistant to the president, made a survey of the line and particularly that portion which passes through the town of Chouteau; staked out the center line through the center of Grove street in the town of Chouteau; made a map of the proposed route, which was submitted to Mr. Goodnow and by him approved on August 29, 1912, at which time he also selected a strip of ground 400 feet wide and 2,600 feet long, lying immediately east of and adjoining Grove street, for depot grounds, yards and other railway purposes. Thereafter options were taken for some of the lands wanted, and on September 6 the county commissioners of Teton county granted to the Puget Sound company a perpetual franchise for the use of Grove street for railway purposes (Chouteau being unincorporated) upon certain conditions mentioned in the resolution evidencing the grant, one of which conditions was that the company should by writing, filed with the county clerk within 30 days, indicate its acceptance of the grant upon the terms imposed. On September 12, 1912, the Great Falls & Teton County Railway Company received its charter as a Montana corporation, and on the same day, at a meeting attended by all the stockholders, the three persons named as incorporators were elected directors of the company, and, the directors having quali-

fied, a meeting was held at which a line theretofore surveyed by engineers employed by the promoters and incorporators was adopted as the line of definite location of the road to be constructed, and authority was given to institute proceedings in eminent domain to obtain lands for right of way, depot grounds, and other railway purposes. On the same day this proceeding was instituted by the filing of the complaint and the issuance of summons. In so far as involved here, the line of definite location of the Great Falls company runs parallel with the east boundary line of Grove street in the town of Chouteau, and the lands sought to be acquired in this proceeding constitute a plot of ground, in general terms, 300 feet wide and about 2,000 feet long, lying immediately east of and adjoining Grove street and included within the plot of ground selected by Mr. Goodnow for station grounds, yards, *etc.* The Puget Sound company appeared by answer and set forth that it had acquired the interests in the lands sought to be condemned theretofore owned by certain of the defendants named; and further alleged that it had taken the steps set forth above looking to the location and construction of its branch road from Saugus to the Canadian line. The trial court found, among other things, that all the lands sought to be condemned are necessary for the use of the Great Falls company, but that a strip thereof 60 feet wide, lying immediately east of and adjoining Grove street (hereinafter called the disputed strip), had theretofore been appropriated by the Puget Sound company for a public use of equal necessity. The order made by the court for commissioners to assess the damages includes all the land desired by the Great Falls company except the disputed strip mentioned, and as to that strip the court dismissed the complaint and refused to include it in the order. The Great Falls company appealed from the order and from the findings in so far as they determine that the disputed strip had been appropriated by the Puget Sound company, and submits for our consideration the contention that the evidence is insufficient to support the findings or conclusion, so far as this disputed slip is concerned.

Upon this appeal we are not concerned with any question which might arise between a railroad company and the private owner of land sought for railroad purposes.  Our concern is only with the question of the priority of right to acquire property for railroad purposes as between competing railroad companies themselves.  In authorizing the Great Falls company to condemn the land described in the order, the court impliedly found that the Puget Sound company had not appropriated any ground for station purposes, yards, or terminal facilities, and of this conclusion complaint cannot well be made.  So far. as the land sought for those distinct purposes is concerned, nothing .was done except that Mr. Goodnow selected it.  Whatever rule may be adopted for determining the priority as between rival roads seeking the same property for railroad purposes when neither company has attached itself to the property by contract or condemnation proceedings, we think that no authority has ever gone to the [1]  extent of holding that the mere mental process of selecting a particular tract of ground wanted for railroad purposes is sufficient to give that company, whose authorized representative may conceal his selection in his own mind, a preference right to acquire the ground.  But the trial court did find that, as to the disputed strip, an appropriation thereof had been made by the Puget Sound company "in order to lay out its road, and the laying out of its road is the public purpose to which said property had already been appropriated."

It will be observed that in this the trial court has followed the language of subdivision 4 of section 4275, Revised Codes. That section is entitled: "Powers of a Railroad Corporation." The introductory clause is: "Every railroad corporation has power."  Then follow eleven subdivisions enumerating those powers.  Subdivision 4 reads as follows: "To lay out its road, not exceeding in width one hundred feet on each side of its center line, unless a greater width be required for the purpose of excavation or embankment, and to construct and maintain the same, with a single or double track, and with such appendages

48 Mont.—4

and adjuncts as may be necessary for the convenient use of the same."

In view of the language employed by the court above, and the facts that Grove street is 80 feet wide, that the center line of the Puget Sound company is in the center of that street, and that this strip 60 feet wide is necessary to give the Puget Sound company 100 feet on the east side of its center line, it seems reasonably clear that it was the theory of the trial court that by making a survey of its center line, staking and mapping the same, and causing the survey to be approved, all prior to the commencement of this condemnation proceeding, the Puget Sound company thereby acquired a preference right, as against its rival, to secure land over which to lay out its road, by virtue of subdivision 4 of section 4275 above, and that the acts which gave rise to such preference right effected an appropriation, to a public use, of a strip of ground 200 feet wide—100 feet on each side of the center line.

For the purposes of this appeal we may assume, without deciding, that in every contest between rival railroads, each seeking the same land for railroad purposes but neither having acquired an interest in it, the question of priority of right is to be determined by the equities of the particular case, and that in the instant case the acts enumerated above are sufficient, in effect, to give the Puget Sound company a preference right. We then approach the important question presented by this appeal, [2]  *viz.:* What is the extent of the right acquired under subdivision 4 of section 4275 above, by the company which has the superior equities?  While that subdivision contains a grant of power to lay out a roadway or right of way and to construct and maintain a single or double track thereon, it does not assume to grant such right of way or roadway. The language "not exceeding in width one hundred feet on each side of its center line" is not a grant but a limitation. In the absence of any necessity for additional grounds for excavation or embankment, the strip 200 feet wide simply marks the utmost limits of the

extent of land which a railroad company may take *in invitum* for roadway or right of way purposes. But no obligation is imposed upon any company to take the full amount permitted, and in the absence of any necessity it cannot do so, either as against the will of the owner or the necessities of a competing road. The strip 200 feet wide is the utmost that it can take, but it may be content with any quantity less which is justified by its reasonable necessities. The line of stakes through the center of Grove street—the only outward, visible evidence of the center line of the Puget Sound company's right of way— gave no indication of the extent of the land which that company desired or needed. But if we adopt the theory of those courts which indulge the presumption in such a case that the full amount allowed by law was intended to be claimed, we are still unable to agree with the conclusion of the trial court. So far [3] as the extent of the right of way is concerned, subdivision 4, above, at most extends to a railroad company the privilege of taking a strip 200 feet wide, if necessary. The privilege may be accepted or it may be waived; and it is waived by taking a less amount. (*Joplin & W. Ry. Co.* v. *Kansas City, Ft. Scott & M. R. Co.,* 135 Mo. 549, 37 S. W. 540.) If the Puget Sound company's preference right to acquire this disputed strip cannot be justified under subdivision 4 above, it cannot be justified at all. It was not in possession of that company; its exterior boundaries were not staked or even surveyed, so far as this record discloses. The right attaches, if at all, by virtue of surveying, staking, mapping and adopting the line through the center of Grove street; and the trial court must have found that it was by virtue of these acts that the Puget Sound company had availed itself of the privileges and powers granted by subdivision 4 above. No other reasonable construction can be given the trial court's findings. That subdivision 4 deals exclusively with land sought for right of way purposes, as distinguished from land needed for yards, depot grounds, terminal, and other railroad facilities, is apparent. That it was not the intention of the legislature to limit

a railroad company to a strip 200 feet wide for all railroad purposes is clearly indicated by the language employed. Subdivisions 3 and 7 of the same section provide for acquiring lands for other railroad purposes.

Our inquiry, then, must be limited to the extent of the preference right which the Puget Sound company acquired to secure [4] land under subdivision 4 above for a right of way. In the first place, that company was not claiming a strip of ground 100 feet on each side of its center line. Beyond the west line of Grove street it was not claiming anything at all except one-half of blocks 4 and 11, and that was claimed only for the purpose of locating a passenger station. It secured a franchise for the use of all of Grove street if it chose to accept the conditions imposed by the county commissioners. But, furthermore, as if to set at rest the question as to the purpose for which all of the land lying east of Grove street, including this disputed strip, was wanted, Mr. Goodnow, who made the selections and who was the only person who assumed to represent or to speak for the Puget Sound company, testified that on August 29, 1912, when the map of the survey was brought to him, he then selected the station grounds desired by his company—a plot of ground 400 feet wide and 2,600 feet long, lying immediately east of and adjoining Grove street and including the strip, 60 feet wide, now in dispute. Continuing, the witness said: "On the west side of Grove street I selected half of block 11 and a portion of the lots immediately north of that in block 4; that is to say, the east half of block 4. * * * That selection was made for the purpose of locating the passenger station. * * * The ground to the east of Grove street was selected for the ordinary purposes of station grounds. I selected 400 feet in width, because it would be necessary to straighten out Spring creek and because I thought it would take some room from the station grounds in order to do that, probably 50 or 75 feet. We expect, of course, to locate elevators and industries of that character on this ground. * * * The west side of Grove street simply accom-

modates the passenger business. · * * * We would propose to hold the land on the east side of Grove street entirely for industrial and passing tracks, *etc.*'' To our minds this seems conclusive that the Puget Sound company was not claiming any ground east or west of Grove street for right of way purposes, but was content to use the street, 80 feet in width, for right of way. Counsel for that company drafted the franchise granting the use of that street, and the intention of his company is indicated, in a measure at least, by Article 1, which reads as follows: ''Article 1. That there be, and there is hereby granted, unto the Chicago, Milwaukee & Puget Sound Railway Company, * * * the perpetual right to use that certain street known as Grove street in the town of Chouteau, and the additions thereto, for the purpose of laying down and maintaining thereon a railway track or tracks, together with the necessary switches, turnouts and sidetracks, and to operate a line of cars over and along the same for the purpose of conveying passengers, freight, express and mail matter, and carrying on such other business as is ordinarily carried on by a railway company.'' It cannot be claimed that any part of the strip 400 feet wide east of Grove street was wanted for right of way. The entire strip was selected for other purposes, and purposes recognized by the statute as altogether distinct from the right of way.

Under the most favorable view which can be adopted, the evidence fails to sustain the finding that the strip of ground 60 feet wide lying immediately east of and adjoining Grove street was appropriated for any public use at the time this proceeding in condemnation was instituted. There is not any evidence that the board of directors of the Puget Sound company ever authorized Mr. Goodnow to adopt a line of definite location of its road, even assuming that so important a corporate act can be delegated. Neither is there any evidence of authority conferred upon the president of that company by the statutes of its parent state or the by-laws of the corporation. There is little, if anything, more than a bare scintilla of evidence that Mr. Goodnow

acted by virtue of a common custom.     There is not any evidence that the franchise granted by the county commissioners for the use of Grove street was ever accepted.

The order of the trial court is reversed and the proceeding is remanded, with directions to eliminate the finding that the disputed strip was appropriated for a public use by the Puget Sound company, and to modify the order for commissioners, so as to include such strip.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SANNER concur.

Rehearing denied November 13, 1913.

(Submitted September 15, 1913.   Decided October 6, 1913.)